# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

ANDREW BOWLES,           )
                             )
     Plaintiff,         )
                             )
     vs.               )     Case number 4:10cv1252 TCM
                             )
MICHAEL J. ASTRUE,      )
Commissioner of Social Security,   )
                             )
     Defendant.      )

## MEMORANDUM AND ORDER

This is a 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying the applications of Andrew Bowles (Plaintiff) for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b.[1]  Plaintiff has filed a brief in support of his complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

Plaintiff applied for DIB and SSI in December 2005, alleging he was disabled as of September 23, 2000, by bipolar disorder, attention deficit disorder, generalized anxiety disorder, and injured shoulders.  (R.[2] at 20-25, 144-48.)  His applications were denied

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of the parties.  See 28 U.S.C. § 636(c).

[2]References to "R." are to the administrative record filed by the Commissioner with his answer.

initially and after a hearing held in February 2007 before Administrative Law Judge (ALJ) F. Terrell Eckert, Jr.  (Id. at 37-76, 79-94, 117-21.)  The Appeals Council then denied Plaintiff's request for review, thereby effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 3-5.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, testified at the administrative hearing.

Plaintiff was 29 years old at the time of the hearing, married, and living in a rented house with his wife and children, one two years old and the other four years old.  (Id. at 41-42.)  He is 5 feet 7 inches tall, weighs 165 pounds, and is right-handed.  (Id. at 43, 44.)  He left school after the ninth grade, and had spent half his class time in special education classes due to his attention deficit disorder.  (Id. at 42-43.)  He quit because he got in with the wrong crowd.  (Id. at 73.)  Also, he learns by doing and not by being told.  (Id.)  He can read, write, and do arithmetic.  (Id. at 43, 65.)  He has a hard time understanding what he has read.  (Id. at 43, 63)

Plaintiff last worked in November 2005.  (Id. at 44.)  He quit that job after two or three months because he could not physically do the work.  (Id.)  His left shoulder is "fused." (Id.)  He cannot lift the left arm above his waist or reach behind his back.  (Id. at 44-45, 49.)  He cannot do any repetitious movements and is in constant pain of a six or seven on a ten-point scale.  (Id. at 45-46.)  If he does any repetitious movement, e.g., doing the dishes, the pain increases to ten.  (Id. at 46-47.)  He cannot lift a gallon of milk with his left arm.  (Id. at 49-50.)  He can lift something lighter, for instance, a jar weighing approximately five

pounds.  (Id. at 50.)  He takes Ultram three times a day and OxyContin once a day for pain.
(Id. at 47.)  He has no side effects from either medication.  (Id.)  He also uses ice and takes
hot showers to relax his muscles.  (Id.)

Presently, Plaintiff's right shoulder is worse than his left because it has not yet been
repaired.  (Id. at 50.)  He is to have surgery on the shoulder, but it has not been scheduled yet.
(Id. at 51.)  His right shoulder is numb in the morning.  (Id. at 52.)  He is unable to grab,
grasp, hold, carry, or climb with that shoulder.  (Id. at 53.)  He cannot reach with it above his
chest or reach behind.  (Id.)  Nor, can he push forward with that arm.  (Id. at 54.)  The pain
in the right shoulder is usually a nine or ten.  (Id.)  He wears an immobilizer on the right
shoulder at night when he goes to bed.  (Id. at 56-57.)

Plaintiff can drive, but has to steer by using his left arm at the bottom of the wheel.
(Id. at 55.)  In an average week, he drives one or two days for an average total of ten to
fifteen  miles.  (Id. at 56)

He has high blood pressure, but does not take any medication for it.  (Id. at 57-58.)

Asked what his most severe mental impairment is, Plaintiff replied that it is the manic
depression, or bipolar.  (Id. at 58.)  This causes him to have bad mood swings and get very
angry at himself or others.  (Id.)  The bad moods are followed by joyful moods.  (Id.)  He quit
a job after snapping at a supervisor due to his mood swings.  (Id. at 59.)  He is seeing a
psychiatrist, Dr. Iqbal, on a regular basis.  (Id. at 60.)  He has contemplated suicide several
times.  (Id. at 65-66.)  He was hospitalized the previous March after having suicidal
tendencies.  (Id. at 68.)

Plaintiff was diagnosed with attention deficit disorder in 1994 after his mother placed him in a "behavioral place" when he was severely depressed.  (Id. at 61.)  He was placed on medication for it, and has taken himself off the medication.  (Id.)  He was also diagnosed with hyperactivity when he was a child.  (Id. at 72-73.)

Plaintiff's wife helped him complete the paperwork when he was applying for DIB and SSI.  (Id. at 64.)

Plaintiff further testified that he cannot do any work at all.  (Id. at 65.)

Plaintiff attends church every Sunday.  (Id. at 69.)

Plaintiff gets anxious in such situations as when he is asked questions.  (Id. at 70.)  Also, he has difficulty going to sleep at night.  (Id.)  He goes to sleep around 3:00 a.m. and wakes up around 6:00 or 7:00 a.m.  (Id. at 71.)  He does not nap during the day.  (Id.)  His neighbor, best friend, and mother all help him with the children.  (Id.)  The most he does to help is get clothes or a diaper for his children.  (Id.)  He watches television, but cannot concentrate on it.  (Id. at 71-72.)

He is looking forward to participating in vocational rehabilitation and getting back to work.  (Id. at 73.)

His shoulder problems limit him more than his mental problems.  (Id. at 74.)

### Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his applications, records from

health care providers, and assessments of his physical and mental residual functional capacities.

When applying for DIB and SSI, Plaintiff completed a Disability Report.  (Id. at 228-38.)  Bipolar disorder, generalized anxiety disorder, attention deficit disorder, and injured shoulders prevent him from working by causing him to have trouble concentrating and remembering things, sometimes to have days when he cannot get out of bed, to have problems lifting and carrying things, and to have limited use of his arms.  (Id. at 229.)  These impairments first bothered him on September 23, 2000, and stopped him from working that same day.  (Id.)  He had worked since then, however, and finally stopped on December 2, 2005.  (Id.)  His medications include Cymbalta for blood pressure, Diovan for hypertension, and Lidoderm patches, oxycodone, and OxyContin for pain.  (Id. at 236.)   All these medications were prescribed out of St. John's Mercy Medical Group.  (Id.)  None had had any side effects.  (Id.)  He had completed the tenth grade, and had been in special education classes.  (Id. at 236-37.)

Plaintiff's wife completed a Function Report on his behalf in January 2006, answering the questions in her husband's voice.  (Id. at 215-22.)  Asked to describe his daily activities, she reported that he gets up, goes to the bathroom, takes a shower, plays with his children, eats lunch, babysits his children while she works, eats dinner, bathes his children and puts them to bed, and then goes to bed.  (Id. at 215.)  His sleep is affected by his shoulder pain and by his mind racing due to the bipolar disorder.  (Id. at 216.)  His ability to take care of personal grooming tasks is not affected.  (Id.)  He prepares breakfast, lunch, and dinner.  (Id.

at 217.)  His ability to do so has not changed since his impairments began.  (Id.)  He does the cleaning, cooking, meal preparation, and laundry.  (Id.)  He goes outside as much as possible.  (Id. at 218.)  He loves to spend money when he is in a manic mood.  (Id. at 219.)  His hobbies include watching television, playing video games, playing with his children, and reading to them.  (Id.)  His impairments affect his abilities to lift, reach, complete tasks, concentrate, follow instructions, understand, use his hands, and get along with others.  (Id. at 220.)  He can walk as far as he needs.  (Id.)  He can pay attention for no longer than two minutes.  (Id.)  He does not finish what he starts and does not follow written instructions well.  (Id.)  He gets along with authority figures well and has never been fired or laid off from a job because of problems getting along with other people.  (Id. at 221.)  He does not handle stress or changes in routine well.  (Id.)  He uses an immobilizer and sling.  (Id.)

The same day, Plaintiff's wife also completed a Function Report Adult – Third Party.  (Id. at 206-14.)  Describing how Plaintiff spends the day, she reported that Plaintiff drinks coffee, watches television, takes a shower, eats breakfast, lunch, and dinner, and goes to bed.  (Id. at 206.)  Plaintiff helps take care of their two boys when she is at work.  (Id. at 207.)  His shoulder problems cause pain and insomnia and make it difficultly for him to put a shirt on or lift his arms to wash his hair.  (Id.)  He prepares his own meals.  (Id. at 208.)  He does house or yard work and shops for groceries when needed.  (Id. at 209.)  His hobbies include watching television, drawing, and writing poems.  (Id. at 210.)  He spends time with his parents and nephew.  (Id.)  He sometimes has difficulty getting along with other people due to his "very low self-esteem" and his paranoia.  (Id.)  Depending on his mood swings, he can

get angry easily.  (<u>Id.</u> at 211.)  His impairments affect his abilities to lift, reach, use his hands, follow instructions, complete tasks, get along with others, and concentrate.  (<u>Id.</u>)  The most he can lift is twenty to twenty-five pounds and he cannot lift this over his head.  (<u>Id.</u>)  He cannot pay attention for long.  (<u>Id.</u>) He can follow written and spoken instructions well, and gets along "pretty good" with authority figures depending on his mood swings.  (<u>Id.</u>)  He does not handle stress or changes in routine well.  (<u>Id.</u> at 212.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of his applications.  (<u>Id.</u> at 223-27.)  There had been no change in his impairments since he had completed the initial report.  (<u>Id.</u> at 223.)  He had not seen any health care providers since that time.  (<u>Id.</u> at 224.)

Also before the ALJ was Plaintiff's earnings record for 1993 to 2005, inclusive.  (<u>Id.</u> at 122.)  His greatest annual earnings were $9,995.00, in 2000; his next greatest were $7,985.27, in 2004.  (<u>Id.</u>)  In the thirteen years in which he had reportable earnings, he worked for forty-five different employers.  (<u>Id.</u> at 127-33.)

He submitted a list of medications naming tramadol and Oxycontin, both prescribed by Dr. Choudhary for pain, and over-the-counter Excedrin for pain.  (<u>Id.</u> at 150.)

The relevant medical records before the ALJ are summarized below in chronological order and begin with the October 13, 2004, records of the Missouri Baptist Medical Center emergency room where Plaintiff sought attention for his right shoulder after he slipped and fell on some grease at his work place, Jiffy Lube.  (<u>Id.</u> at 428-40.)  His shoulder was reduced

and he was discharged home with instructions to wear a sling and take Vicodin as needed. (Id. at 434, 400.)

Plaintiff consulted Dwayne Helton, D.O., on January 9, 2005, about his rotator cuff injury.  (Id. at 410.)  He was to be scheduled for a an magnetic resonance imaging (MRI) and computed tomography (CT) scan of his right shoulder and was to have an orthopedic consultation on January 27.  (Id.)  He was prescribed fifty dosages of Ultram[3] (tramadol), a narcotic-like pain reliever, and told not to take more than eight a day.  (Id.)  There were no refills.  (Id.)  Five days later, he returned to Dr. Helton for a refill of the Ultram.  (Id. at 409.) He was given a prescription for 100 dosages of Ultram, with the same maximum to be taken per day, and two refills.  (Id.)  CT scans of Plaintiff's abdomen and pelvis taken on February 14 were unremarkable.  (Id. at 407-08.)

Ashish Gulve, M.D., with the Barnes-Jewish Washington University Pain Management Center (the Pain Management Center), evaluated Plaintiff on January 14.  (Id. at 414-26.) Plaintiff reported having been hit by a car when he was fourteen years old.  (Id. at 420.)  He smoked one pack of cigarettes a day and marijuana.  (Id. at 421.)  He rarely drank alcohol. (Id.)  Dr. Gulve concluded as follows.

> [Plaintiff] was insisting that I should give him a prescription for his Ultram or
> consider a stronger narcotic prescription.  My opinion is that [Plaintiff]
> probably has irreversible disease in both shoulders.  His pain may well be
> responsive to narcotics, given the existing pathology.  However, this pathology
> is irreversible and he would have to be on narcotics for the rest of his life.  I
> will leave it to his primary care physician and his referring physician to address

---

[3]Ultram is "a narcotic-like pain reliever" for the treatment of moderate to severe pain. Drugs.com, http://www.drugs.com/search.php?searchterm=ultram (last visited Sept. 9, 2011).

narcotic prescription. I will be basing my management mainly on nonnarcotic prescriptions for his neuropathic pain.

Today I suggested to [Plaintiff] the possibility of referral to a pain psychologist. However, [Plaintiff] feels he does not need help from a psychologist at this stage. My personal opinion, given this type of disability at such a young age and the fact that pain is making him irritable and depressed, as stated by him in his self-assessment questionnaire, is that he would benefit from psychological evaluation. . . .

(Id. at 426.) Plaintiff was to follow-up in four weeks. (Id. at 416.)

Plaintiff did not show for his next appointment at the Pain Management Center. (Id. at 412.) It was later noted that his health care insurer had put him on a "medication lockdown" and required that only his primary care physician and Dr. Gulve refill his medications. (Id.)

When Plaintiff next saw Dr. Helton, on March 4, he reported left and right shoulder pain and had a decreased range of motion in each. (Id. at 406.) He reported having a history of bipolar affective disorder, for which he had had no treatment for some time, and having trouble with frequent mood swings. (Id.) He was prescribed Paxil[4] and Depakote.[5] (Id.)

Plaintiff returned to Dr. Helton the next month, reporting that he had stopped taking the Paxil and Depakote because they kept him from sleeping and his mood swings were worse. (Id. at 405.) His right arm was in a sling. (Id.) He was diagnosed with bipolar affective disorder, generalized anxiety disorder, and chronic shoulder pain. (Id.) He was

---

[4]Paxil is a psychotropic medication for the treatment of major depressive disorder. Physicians' Desk Reference, 1491, 1492 (65th ed. 2011).

[5]Depakote is prescribed for manic or mixed episodes associated with bipolar disorder. Id. at 425.

prescribed Buspar, an anti-anxiety medication,[6] and Neurontin, prescribed for neuropathic pain conditions.[7]  (Id.)

X-rays taken of Plaintiff's right shoulder on June 7 revealed no dislocation or fracture. (Id. at 401-04.)

Four days later, Plaintiff explained to Dr. Helton that he was tired of waiting on the Wohl Clinic at Barnes so had an appointment in six days with Dr. Clayton Perry at the Forest Park Medical Building.  (Id. at 396.)  He had fallen in the shower and had injured his right shoulder.  (Id.)  He was prescribed Buspar, Neurontin, and Ultram.  (Id.)  Attention deficit hyperactivity disorder (ADHD) was added to his list of impairments.  (Id.)  He was to return in three months or as needed.  (Id.)

Plaintiff returned to Dr. Helton on September 9, reporting that he was "having a lot more pain in his shoulder."  (Id. at 395.)  He had recently had a complete dislocation of the right shoulder with reduction.  (Id.)  He was seeing an orthopedist at Forest Park Hospital.

---

[6]See Drugs.com, http://www.drugs.com/search.php?searchterm=buspar (last visited Sept. 9, 2011).

[7]See mediLexicon, http://www.medilexicon.com/drugs/neurontin_783.php (last visited Sept. 9, 2011).

(Id.)   He was given prescriptions for Buspar, Neurontin, Percocet,[8] Paxil, Lidocaine,[9] Klonopin,[10] and Geodon.[11]   (Id.)   No refills were given for any of these medications.  (Id.)

Plaintiff went to the emergency room at Phelps County Regional Medical Center (Phelps Center) on September 19 with complaints of "terrible" right shoulder pain.  (Id. at 363-69.) He had fallen on the shoulder and was now unable to move it.  (Id. at 363.)  He was tearful and grimacing in pain.  (Id.)  Plaintiff was given intravenous dosages of Demerol.[12] (Id. at 366.)  His shoulder was x-rayed and then placed in an immobilizer.  (Id. at 365, 369.) He was discharged home and walked from the emergency room with a steady gait.  (Id. at 366.)

Four days later, he returned, again complaining complaints of extreme pain in his right shoulder.  (Id. at 322-31, 359-62, 389-90.)  There was no evidence of severe anxiety; Plaintiff was alert and oriented to time, place, and person.  (Id. at 324.)  His affect was appropriate; no mood swings were noted.  (Id. at 326.)  His gait was steady; his range of motion was

---

[8]Percocet, a combination of oxycodone hydrochloride and acetaminophen, is prescribed for the relief of moderate to moderately severe pain.  Physicians' Desk Reference at 1096, 1097.

[9]Lidocaine, or Lidoderm, is a local anesthetic agent to be applied to skin.  Id. at 1084.

[10]Klonopin is used for the treatment of seizure or panic disorders.   Drugs.com, http://www.drugs.com/search.php?searchterm=klonopin (last visited Sept. 9, 2011).

[11]Geodon is an antipsychotic medication  for the treatment of bipolar disorders.  Physicians' Desk Reference at 2793.

[12]Demerol is  a  narcotic  pain  reliever  similar  to  morphine.     Drugs.com, http://www.drugs.com/search.php?searchterm=demerol (last visited Sept. 9, 2011).  Plaintiff is allergic to morphine.

unlimited.  (<u>Id.</u> at 325.)  An x-ray revealed right shoulder subluxation.[13]  (<u>Id.</u> at 362.)  He had decreased muscle strength in his right and left upper extremities.  (<u>Id.</u> at 325.)  He needed his medication refilled, and had been "unable to see Dr. Weisfeld [sic] due to insurance issues."  (<u>Id.</u> at 330.)  He was discharged ninety minutes later.  (<u>Id.</u> at 329.)

Four days after that, on September 27, he went to the St. John's Internal Medicine Clinic (St. John's Clinic) for pain management.  (<u>Id.</u> at 388.)  He was seen by a family nurse practitioner, was given medication, including Percocet to be taken every three to six hours, and was to return in ten days.  (<u>Id.</u>)  Plaintiff returned on October 3, explaining that he had been taking the Percocet every three hours for pain and needed a refill.  (<u>Id.</u> at 387.)  He was given Endocet, a combination of oxycodone and acetaminophen, and told that he would need to have an orthopedic evaluation before being given any more pain medication.  (<u>Id.</u>)

Plaintiff had an orthopedic consultation by Eric Willoughby, a community nurse practitioner, on October 7.  (<u>Id.</u> at 385.)  He was to be referred for a MRI arthrogram of his right shoulder and was to continue taking his pain medication.  (<u>Id.</u>)  The MRI showed anterior subluxation of the humeral head and a supraspinatus tendon tear with subscapularis and biceps tendinosis.  (<u>Id.</u> at 382-83.)  Three days after the MRI, on October 20, Plaintiff reported an increase in his shoulder pain.  (<u>Id.</u> at 379.)  The OxyContin[14] was alleviating the pain for only six to eight hours; his dosage was increased.  (<u>Id.</u>)

---

[13]Subluxation is "[a]n incomplete . . . dislocation." <u>Stedman's Medical Dictionary</u>, 1693 (26th ed. 1995).

[14]OxyContin is a controlled-release form of oxycodone hydrochloride, an opioid agonist, and is used for the "around-the-clock" management of moderate to severe pain and is not be used on "an as-needed basis." <u>Physicians' Desk Reference</u> at 2879, 2880.

On October 27, Plaintiff was seen by Steven C. Weissfeld, M.D., (Id. at 377-78, 386.)
Dr. Weissfeld diagnosed Plaintiff with a "[g]rossly unstable right shoulder secondary to
[multidirectional instability]-atraumatic." (Id. at 386.) He was to be referred to Barnes
Hospital in St. Louis for consultation and was to continue at the St. John's Clinic for pain
control pending that consultation. (Id.)

Plaintiff was seen at the St. John's Clinic on November 3; his OxyContin was refilled.
(Id. at 376.) He noted that his blood pressure returned to normal when his pain was
controlled. (Id.)

Dr. Helton saw Plaintiff again on November 13 for continued right shoulder pain and
weakness. (Id. at 394.) Plaintiff reported that his "'nerves'" were "better on the current
medication regime." (Id.) His dosages of Paxil and Geodon were increased; his prescriptions
for Neurontin, Percocet, Lidocaine, and Klonopin were renewed in the previous dosages.
(Id.) Plaintiff thought he would have an appointment at Wohl Clinic in January or February.
(Id.)

Plaintiff returned to the Phelps Center emergency room on November 14 for
complaints of controlled pain in his right shoulder. (Id. at 332-38, 354-56.) He refused a
medical screening exam, decided to go to his physician when the office opened in thirty
minutes, and left the emergency room within an hour of arrival. (Id. at 336, 338.)

Three days later, Plaintiff was seen at the St. John's Clinic complaining of "break thru"
pain with changes in weather. (Id. at 375.) His pain was an eight on a ten-point scale and
he had decreased sensation and numbness in his right arm. (Id.) He was unable to perform

- 13 -

an active range of motion.  (Id.)  He reported that Cymbalta[15] helped, but he had run out of

the medication.  (Id.)   His dosage was increased and his OxyContin prescription was

renewed.  (Id.)

He returned to the St. John's Clinic on November 25 to have a paint chip removed

from his left eye.  (Id. at 374.)  His shoulder pain was controlled and was a four.  (Id.)  On

December 1, he was seen again at the St. John's Clinic for a refill of his OxyContin.  (Id. at

373.)  He reported that his shoulder pain was worse in the early morning and at night.  (Id.)

He had been continuously wearing his sling and wearing a Lidoderm patch.  (Id.)  He further

reported that he was sleeping only two to three hours at night.  (Id.)  He was given a

prescription for Ambien and refills of Cymbalta and OxyContin.  (Id.)

On December 13, Plaintiff went to the Phelps County emergency room "with a

reported recurrent dislocation of his right shoulder."  (Id. at 299-301, 339-53.)  He had

dislocated the shoulder two hours earlier, was crying, and was unable to lie still.  (Id. at 342.)

His pain was a ten on a ten-point scale.  (Id. at 346.)  The emergency room doctor, Frank

Elders, D.O. observed that

> [Plaintiff] seemed to be in "agony" and was holding his arm very still.  He was
> holding it in internal rotation across his right pelvic area.  He absolutely reused
> any movement of it, stated it felt like something was being pinched in his
> shoulder and that his hand felt different than previous.  He had good color and
> warmth to his hand and good pulses distally.  I had seen this gentleman in the
> past.  He has been here approximately 4 times since September for the same
> thing.  With his permission, we did IV conscious sedation and attempted
> reduction.  I could not get his shoulder joint to budge whatsoever.  I re-x-rayed

[15]Cymbalta is prescribed or major depressive or generalized anxiety disorders.  Physicians'
Desk Reference at 1758.

it.  I see no change in it from previous x-ray.  I discussed the case with Dr. Marti and before I even mentioned it to him that I had attempted reduction, Dr. Marti stated that his shoulder has been out for approximately 6 years, and I did not need to attempt reduction.  He has been referred to Barnes Hospital numerous times for this and, in fact, was at Salem ED yesterday for the same thing.  We suspect that he may be actually seeking narcotics.  When I went back in to talk to [Plaintiff], after having reversed his medications with Narcan and Romazicon, he was very calm.  He did not appear to be in any distress, as he had been before.  I advised him that the shoulder had been out for several years and he just needed to follow up with his doctor.  He was very calm and accepted that and had earlier told me that he has an appointment with an orthopedic surgeon at Barnes Hospital in 1 week.  He leaves here in stable and good condition.

(Id. at 339.)  On discharge, his pain was a four.  (Id. at 347.)

Two days later, Plaintiff reported to the family nurse practitioner at the St. John's Clinic that his shoulder pain was worse.  (Id. at 372.)  He was taking OxyContin five times a day due to his pain, and not twice a day as instructed.  (Id.)  He had an appointment with a surgeon in St. Louis on December 20.  (Id.)

On December 18, Plaintiff went to the Barnes Jewish Hospital emergency room with complaints of a painful right shoulder.  (Id. at 253-77.)  He had dislocated the shoulder four days earlier when lifting furniture and was unable to move it.  (Id. at 255-57, 263.)  X-rays revealed a subluxation with a reducible then subluxed right shoulder.  (Id. at 267-68, 273.)  The reviewing orthopaedic doctors opined that it was a subacute injury to the plexus and Plaintiff could wait to be seen in a clinic in the next two days.  (Id. at 268.)  His right shoulder was placed in a splint, and he was sent home with pain medication.  (Id.)

Plaintiff consulted the nurse practitioner at the St. John's Clinic on January 5, 2006, for a refill of Ambien and "possibly something for anxiety."  (Id. at 371.)  He reported that

- 15 -

he had been having some mood swings and anger issues when dealing with family.  (Id.)  His pain was a six.  (Id.)  Barnes Hospital was called to expedite his appointment.  (Id.)  He was started on Lexapro, prescribed for the treatment of a major depressive disorder.  (Id.)

On January 19, Plaintiff was admitted to the Phelps Center after being taken to the emergency room by police when they found him wandering around town, after having driven his car into a ditch, and clearly intoxicated with Xanax.  (Id. at 302-21.)  He had admittedly taken more than the prescribed amount "to get a 'high.'"  (Id. at 306.)  He had problems with anxiety and dysthymia.[16]  (Id.)  He was combative in the emergency room, swinging at staff and security, and made suicidal statements.  (Id. at 303, 308.)  He reported that he was taking Cymbalta, which generally controlled his anxiety.  (Id. at 308-09.)  He had had some "emotional problems" when he was young, but had not had any for a long time.  (Id. at 309.)  He had never gone to the emergency room for his anxiety symptoms, but had the problems "just at home."  (Id.)  The anxiety episodes lasted for a short period and "could happen a few times a day."  (Id.)  He further reported that he had been hospitalized when he was 14 years old and diagnosed with bipolar disorder.  (Id.)  At the time, his parents were getting divorced and there were problems at home.  (Id.)  He had not taken medication for a long time after that and had only recently begun taking Cymbalta.  (Id.)  Also, he had had problems with cocaine and alcoholism, but had been sober since he was 16 until the Xanax episode.  (Id.)

---

[16]Dysthymia is "[a] chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms:  poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness."  Stedman's Medical Dictionary at 536.

He had not taken cannabis in the past three or four years; his drug screen on arrival at the emergency room was positive for it and for amphetamines.  (Id. at 308, 309.)  He was currently unemployed but was in a vocational rehabilitation program and wanted to obtain a trade other than the carpentry and cabinet making he had been doing until injuring his shoulder.  (Id. at 309.)  He did not appear to be in any distress.  (Id.)  He "was calm, verbal, relaxed and cooperative, pleasant."  (Id. at 310.)  His "[s]peech was clear, coherent, goal directed, spontaneous without any thought disorder."  (Id.)  "There was no evidence of auditory or visual hallucinations, delusional ideation."  (Id.)  His Global Assessment of Functioning (GAF) rating on admission was 40.[17]  (Id.)  He had decreased strength in his right upper extremity and normal strength in his right lower extremity and his left upper and lower extremities.  (Id. at 319.)  He had a partial range of motion in his right upper extremity and a full range of motion in his right lower extremity and his left upper and lower extremities.  (Id.)  There was no evidence of severe anxiety, and he was alert and oriented to person, place, and time.  (Id. at 321.)  He was diagnosed after admission with panic disorder with agoraphobia,[18] dysthymia, and benzodiazepine intoxication.  (Id. at 306.)  Once the effects of the Xanax started to dissipate, Plaintiff started to think more clearly.  (Id. at 306.)  He

---

[17]"According to the [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010).  A GAF score between 31 and 40 is indicative of "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ."  DSM-IV-TR at 34 (emphasis omitted).

[18]Agoraphobia is "[a] mental disorder characterized by an irrational fear of leaving the familiar setting of or venturing into the open . . . ."  Stedman's Medical Dictionary at 38.

explained that he used to have problems with alcoholism and had abused the Xanax because it made him feel the same way.  (Id.)  On discharge four days later, his affect was bright and cheerful.  (Id. at 306.)  He was not psychotic and had no suicidal or homicidal ideation.  (Id.)  He was taking his medication and was motivated to stay sober and not abuse prescription medication.  (Id.)  His diagnosis was "[a]t this time a panic disorder with agoraphobia."  (Id. at 307.)  His GAF was 65.[19]  (Id.)

On February 23, Plaintiff reported to the Barnes Jewish Hospital orthopaedic clinic that his right shoulder pain was a nine on a ten-point scale.  (Id. at 247-52.)

Plaintiff went to the Barnes Jewish Hospital surgical speciality clinic on March 30, requesting a right shoulder fusion and explaining that his left shoulder fusion had worked well.  (Id. at 241-46.)  The physician, Mark Schinsky, M.D., was to review his records with the "shoulder team" and call Plaintiff with a plan.  (Id. art 241)

An x-ray taken on April 1 of his right shoulder revealed an anterior right shoulder dislocation.  (Id. at 292.)

Plaintiff was seen by M. Akhtar Choudhary, M.D., at the Rolla Neurology Pain and Sleep Center on April 13 for his complaints of right shoulder pain and weakness.  (Id. at 293-94.)  Without medication, his pain was an eight to nine on a ten-point scale; with medication, it was a four.  (Id. at 293.)  He was taking OxyContin, Ultram, and Ambion, a lidocaine

---

[19]A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV-TR at 34 (emphasis omitted).

patch.  (Id.)  He smoked about two packs of cigarettes a day and denied any history of drinking or using drugs.  (Id.)  He was to gradually taper the OxyContin, increase the Ultram dosage, and start taking Topamax.  (Id. at 294.)  He was to return in four weeks.  (Id.)

On June 7, Plaintiff had a physician diagnostic evaluation at Pathways CBH, Inc. (Pathways).  (Id. at 284-91.)  He reported problems with anxiety, depression, and mania.  (Id. at 284.)  He presented with symptoms of agitation, excessive worry, irritability, poor concentration, restlessness, sleep disturbance, tension, anhedonia (the absence of pleasure), excessive guilt, low self-esteem, insomnia, and hopelessness.  (Id.)  He reported that he had been on psychotropic medications for the past twelve years, but was not currently taking any. (Id. at 285, 287.)  His father had died ten weeks ago.  (Id. at 285.)  He had been diagnosed with ADHD when he was fourteen and with an anxiety disorder eight years earlier.  (Id. at 286.)  He had once attempted suicide by trying to overdose on his father's blood thinner.  (Id.) He stopped using alcohol, marijuana, and cocaine seven to eight years ago.  (Id.)  He was unable to work for any length of time because he would either quit or not show up.  (Id. at 287.)  When he did work, he did a good job; but, he would lose interest.  (Id.)  His father was a manic-depressive.  (Id. at 288.)  Both his parents were dependent on alcohol and drugs. (Id.)  He had been arrested for a driving under the influence – he was on pain medication at the time – and had a court date the next month.  (Id.)  On examination, he had an anxious affect, a depressed mood, normal thought processes, and poor insight and judgment.  (Id. at 289.)  He blamed others.  (Id.)  He did not have any current suicidal or homicidal ideation. (Id. at 290.)  He was motivated for treatment and willing to change.  (Id. at 291.)  He was

diagnosed with bipolar disorder and prescribed Zyprexa[20] and Tegretol.  (Id.)  ADHD was to be ruled out.  (Id.)  His current GAF was 45.[21]  (Id.)

Plaintiff cancelled his June 22 appointment and rescheduled it for four days later.  (Id. at 282.)   Plaintiff saw Fauzi Iqbal, M.D., on June 26 "for a follow-up medication management session."  (Id. at 280-81.)  He had not been taking the Zyprexa because his mother had told him it could cause heart problems, high blood pressure, and diabetes.  (Id. at 280.)  He had not been taking the Tegretol either.  (Id.)  He had a dysphoric and anxious affect and was "[p]reoccupied with pain issues."  (Id.)  He denied suicidal or homicidal ideation, intent, or plan.  (Id.)  Dr. Iqbal opined that he was not motivated for treatment because he was not taking the Tegretol or the Zyprexa on a regular basis and had not contacted the office about any concerns.  (Id.)  After a discussion of the risks and benefits of the two medications, Plaintiff agreed to try taking the Tegretol on a regular basis.  (Id.)

Plaintiff did not keep his September 6 and 13 appointments at Pathways.  (Id. at 278-79.)

Also before the ALJ were assessments of Plaintiff's physical or mental functional capacities.

In March 2006, Michael P. Stacy, Ph.D., completed a Psychiatric Review Technique form (PRTF) for Plaintiff.  (Id. at 184-97.)  Plaintiff was described as having an anxiety-

---

[20]Zyprexa is prescribed for the treatment of schizophrenia.  Physicians' Desk Reference at 1850.

[21]A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV-TR at 34 (emphasis omitted).

related disorder, i.e., panic disorder, that was not severe.  (Id. at 184, 189.)  This disorder resulted in mild difficulties in maintaining concentration, persistence, or pace; mild restrictions of activities of daily living; and no difficulties in maintaining social functioning. (Id. at 194.)  There were no episodes of decompensation of extended duration.  (Id.)

The same month, a Physical Residual Functional Capacity Assessment (PRFCA) of Plaintiff was completed by an agency nonmedical consultant, J. Hays.  (Id. at 198-205.)  The only diagnosis was bilateral shoulder pain.  (Id. at 198.)  This impairment resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; and stand, walk, or sit about six hours in an eight-hour day. (Id. at 199.)  His ability to push or pull was otherwise unlimited.  (Id.)  It was noted that Plaintiff had "a long history of shoulder dislocations which have resulted in numerous surgical procedures." (Id.)  He had postural limitations of only occasionally climbing ladders, ropes, or scaffolds.  (Id. at 200.)  He had a manipulative limitation of not being able to perform work which required a frequent above-the-shoulder use of either upper extremity. (Id. at 201.)  He had no visual, communicative, or environmental limitations.  (Id. at 201-02.)

## The ALJ's Decision

The ALJ first noted that the pending applications were Plaintiff's fifth round.  (Id. at 83.)  His fourth application had been filed on June 2, 2005, and had alleged disability since September 25, 2000, caused by pain, limited functioning in both shoulders, surgeries on both shoulders, bipolar disorder, major depressive disorder, anxiety, ADHD, and a history of a broken collar bone.  (Id.)  Associated with these impairments were manic symptoms, suicidal

ideation, anxiety, and depression.  (Id.)  The medical records submitted pursuant to this fourth application included references to left shoulder arthrodesis, surgical amputation of the left humeral head, soft tissue arthroplasty in the right shoulder, and a right inguinal hernia repair.  (Id.)  They "required consideration of drug abuse and alcohol abuse."  This application was denied on August 10, 2005, and not pursued further.  (Id.)  The ALJ decided that there was no evidence to warrant the reopening of the adverse decision.

The ALJ then noted that Plaintiff's current applications, filed in December 2005, include the same alleged disability onset date as the June 2005 application and the same issues, complaints, allegations, and medical records.  (Id.)  He found that "the medical record does not establish that, during the period through August 10, 2005, [Plaintiff] had any respiratory, neurological, mental, musculoskeletal, cardiovascular or sclerotic impairment or any impairment of [his] immune system which have undergone regulatory changes with respect to the listings since August 10, 2005."  (Id.)  Nor was there any new and material evidence revealing any objective medical findings that were substantially and materially different than those that would have been evaluated pursuant to the June 2005 application.  (Id.)  Consequently, the period from September 2000 to August 10, 2005, was res judicata and Plaintiff was not disabled for that entire period.  (Id. at 83-84.)

The question then was whether he was disabled after August 10, 2005.  (Id. at 84.)

The ALJ found that Plaintiff had a generalized anxiety disorder, dysthymia, depression, poly-drug abuse – prescription and cannabis, a history of degenerative disc

disease of the lumbar spine,[22] a history of recurrent left shoulder dislocation followed by surgical arthrodesis, and a history of recurrent right shoulder dislocation with chronic pain. (Id.)  The mental impairments were not severe and all the impairments did not, singly or in combination, meet or medically equal an impairment of listing-level severity.  (Id.)

In determining whether the impairments precluded Plaintiff from performing past relevant work or any other work existing in significant numbers, the ALJ evaluated the credibility of his subjective complaints.  (Id. at 84-91.)

Addressing the question of Plaintiff's mental impairments, the ALJ found that "[t]he medical records do not document ongoing mental health treatment aggressively sought and received for complaints of severe depression or anxiety since January 2006.  The medical records do not document a severe mental impairment since January 2006."  (Id. at 86.) Additionally, "the medical treatment notes [did] not document any medical observations, by any treating psychiatrist or psychologist, of significant abnormalities or deficits" in Plaintiff's mental functioning.  (Id. at 86-87.)  The medical records did document ongoing substance abuse and inconsistent reports by Plaintiff of his drug use.  (Id. at 87.)  The ALJ then concluded as follows with respect to Plaintiff's allegations of a severe mental impairment.

> [T]he medical records document diagnoses of a generalized anxiety disorder, a bipolar disorder and an affective disorder.  However, these diagnoses are also accompanied by diagnoses of substance dependence–prescription drugs, benzodiazepine intoxication, poly drug abuse and a substance induced mood

---

[22]In support of this conclusion, the ALJ cited medical records from 2000 to August 2004. These records are not included in the instant administrative record.  See 20 C.F.R. § 404.1512(d)(2) (defining "complete medical history" as the medical records covering at least the 12 months preceding the month in which the claimant filed his application); § 416.912(d)(2) (same).

- 23 -

disorder.  These diagnoses are accompanied by ongoing use of cannabis and other substances.  These diagnoses are accompanied by possible drug seeking behavior through multiple medical sources.  These diagnoses are accompanied by statements regarding cannabis abuse which are grossly inconsistent with the medical facts.  These diagnoses must be considered in light of the significant improvement in [Plaintiff's] symptoms when compliant with treatment and when abstinent from drug abuse.  These diagnoses must be considered in light of the overall absence of objective medical findings documenting long term and significant deficits in functioning related to any mental impairment. . . .

(Id.)

Addressing Plaintiff's shoulder problems, the ALJ again summarized earlier medical records[23] and ones of more recent treatment.  (Id. at 87-89.)  He concluded that the medical records documented recurrent right shoulder dislocations with accompanying pain and limited functioning.  (Id. at 89.)  The disabling symptoms associated with such dislocations, however, were dependent on Plaintiff's credibility and such was lacking.  (Id.)  Specifically, it was noted in the December 2005 medical records that Plaintiff had had his condition for years and appeared to be actually seeking narcotics.  (Id.)  Indeed, those records reflect that Plaintiff was no longer in "'agony'" once he was approached about changing medications and elected to wait until his orthopedic appointment in one week.  (Id.)  The medical records also reflected a reduction in the level of Plaintiff's pain when he was compliant with treatment.  (Id. at 90.)  Past medical records reflect treatment for pain in May 2002 when he lifted a bag of seed weighing at least 150 pounds, in June 2002 when he rolled a four-wheeler, in September 2002 when he slipped out of the back of a truck, in November 2002 when he chased a truck that had fallen out of gear, in March 2003 when he fell when shoveling snow,

---

[23]See note 22, supra.

in June 2003 when he was moving furniture, in March 2004 "when a 'horse spooked'" him, in September 2004 when he crashed when riding motorcross and landed on his shoulder, in December 2004 when he reported he had been in a dirt bike accident two months earlier, in October 2004 when "'he fell at work,'" and December 2005 when he was moving furniture. (Id.)  The ALJ concluded that these activities were inconsistent with Plaintiff's allegations of ongoing disability.  (Id.)

Also, there were no records of any side effects from Plaintiff's prescribed medication and there were records reflecting that Plaintiff's symptoms were controllable through treatment.  (Id.)  His complaints of pain and mental difficulties did not prevent him from cooking, bathing, driving, caring for his two children when his wife was working, playing video games, and visiting.  (Id. at 90-91.)  He had a "very sporadic work history," and his third highest yearly earnings were in 2004, "four years into his alleged period of disability."  (Id. at 91.)

Based on the foregoing, the ALJ concluded that Plaintiff had residual functional capacity (RFC) to frequently lift and carry less than ten pounds and occasionally lift and carry less than twenty pounds.  (Id.)  He should avoid any overhead work activities with either upper extremity.  (Id.)  With this RFC, he could perform "a very wide range of light work activities."[24]  (Id.)  Although this RFC precluded him from performing any past relevant work, he could, according to the Medical-Vocational Guidelines, perform work existing in

---

[24]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).

significant numbers in the local and national economies.  (Id. at 91-92.)  He was not, therefore, disabled within the meaning of the Act.  (Id. at 92.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; **Hurd**, 621 F.3d at 738; **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738.  Second, the claimant must have a severe impairment.  See 20 C.F.R. §§ 404.1520(c), 416.920(c).  The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  Id.  Accord **Martise v. Astrue**, 641 F.3d

- 26 -

909, 923 (8th Cir. 2011); **Pelkey v. Barnhart**, 433 F.3d 575, 578 (8th Cir. 2006). Conversely, "[a]n impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to work," i.e., "[it] would have no more than a minimal effect on the claimant's ability to work . . . ." **Kirby v. Astrue**, 500 F.3d 705, 707 (8th Cir. 2007). "Severity is not an onerous requirement . . . , but it is also not a toothless standard . . . ." **Id.** at 708 (internal citations omitted).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations."  **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence including the medical records, observations by treating physicians and others, and an individual's own description of his limitations.'"  **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord

**Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).  "'The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record.  [A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'"  **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)) (second alteration in original).

"'Before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility.'"  **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)).  This requires that the ALJ consider "'(1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'"  **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011) (quoting Moore, 572 F.3d at 524).   After considering these factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints.  **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e).  Additionally, "[a]n

ALJ may find the claimant able to perform past relevant work if the claimant retains the ability to perform the functional requirements of the job as [ ]he actually performed it or as generally required by employers in the national economy." **Samons v. Astrue**, 497 F.3d 813, 821 (8th Cir. 2007).  The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work.  **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  See also 20 C.F.R. §§ 404.1520(f), 416.920(f).

> "If [a claimant's] impairments are exertional (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'grids,' which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment."

**Holley v. Massanari**, 253 F.3d 1088, 1093 (8th Cir. 2001) (quoting Beckley, 152 F.3d at 1059).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones v. Astrue**, 619 F.3d 963, 968 (8th Cir. 2010); **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. "'If, [however,] after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" **Partee**, 638 F.3d at 863 (quoting Goff, 421 F.3d at 789). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## Discussion

Plaintiff argues that the ALJ erred in (1) finding him not credible and (2) not soliciting the testimony of a vocational expert (VE).  In support of his first argument, Plaintiff contends that the ALJ (a) should have ordered additional testing to adequately evaluate his credibility if he found such was lacking, (b) did not give appropriate weight to his subjective complaints, and (c) should have made his credibility assessment based on the entire record and not only on his daily activities.

As noted above, when assessing a claimant's RFC, ALJ must evaluate his credibility. And, when evaluating a claimant's subjective complaints, an ALJ may properly consider whether those complaints are supported by the objective medical evidence, although a lack of such support may not be the only reason for discounting his complaints.  **Halverson v. Astrue**, 600 F.3d 922, 931-32 (8th Cir. 2010).  "'A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms.'"  **Martise**, 641 F.3d at 923 (quoting 20 C.F.R. § 404.1508) (alteration in original).  See also 42 U.S.C. § 423(d)(5)(A) (requiring that a claimant's complaints of pain or symptoms not be conclusive evidence of disability but there also be "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques").  Pain is a symptom, not an impairment.  See 20 C.F.R. §§ 404.1569a(a), 416.969a(a).  Plaintiff portrayed his pain as a symptom of his shoulder impairments.  As explained below, the ALJ did not err in finding his allegations of disabling pain not to be credible.

First, the lack of objective medical evidence supporting Plaintiff's subjective complaints may not be the sole basis for rejecting those complaints, but it is a proper consideration.  See **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005).

Second, "'[an] ALJ may disbelieve subjective complaints if there are inconsistencies in the evidence as a whole.'"  **McCoy v. Astrue**, 648 F.3d 605, 614 (8th Cir. 2011) (quoting Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004)).  The record before the ALJ was replete with inconsistencies.  For instance, whether Plaintiff was smoking marijuana and when he had stopped varied from medical record to medical record.  He told an emergency room doctor he had been an alcoholic; he told Dr. Choudhary he did not have a history of drinking or using drugs.  He gave different health care providers different versions of why he had been hospitalized at the age of fourteen.  His version of his psychiatric history also varied.  He told Dr. Helton he had an appointment six days later with an orthopedist to see about his shoulder; Dr. Helton then prescribed pain medication.   There is no record of such an appointment.  Instead, he returned to Dr. Helton three months later with complaints of pain in right shoulder and told him he was seeing the orthopedist.  There are no records of such.  He claimed disabling pain and mental impairments, but declined to see a pain psychologist.  When told he had to have a medical exam before being given medication for his alleged agonizing pain, Plaintiff decided to wait to see his own physician when the office opened in thirty minutes.  He did not.

Third, Plaintiff's very sporadic work history – he worked for an average of at least three employers per year – detracted from his credibility. See **Wildman v. Astrue**, 596 F.3d 959, 968-69 (8th Cir. 2010) (ALJ properly considered claimant's sporadic work history prior to her alleged onset date as detracting from her credibility); accord **Bradley v. Astrue**, 528 F.3d 1113, 1115 (8th Cir. 2008).  And, he continued to work after his alleged disability onset date, earning his highest annual earnings of $9,995.00 the year in which he became disabled and his second highest, $7,985.27, four years later.  See **Medhaug v. Astrue**, 578 F.3d 805, 816 (8th Cir. 2009) (noting that a relevant factor in the ALJ's adverse credibility finding was the claimant continuing to work after the alleged onset of disability); **Goff**, 421 F.3d at 792-93 (finding that when evaluating the claimant's credibility the ALJ properly considered the fact that the claimant worked with his allegedly disabling impairments for three years and had no evidence of any deterioration); accord **Blakeman v. Astrue**, 509 F.3d 878, 882 (8th Cir. 2007).

Fourth, Plaintiff reported to Dr. Schinsky that his left shoulder fusion had worked well and tests revealed that he had a full range of motion in that shoulder.  There is no record of Plaintiff following-up with Dr. Schinsky for a similar surgery on his right shoulder.  "Impairments that are controllable or amenable to treatment do not support a finding of disability." **Davidson v. Astrue**, 578 F.3d 838, 846 (8th Cir. 2009).

Fifth, a claimant's daily activities are proper considerations when evaluating his credibility.  See **Buckner**, 646 F.3d at 558; **Halverson**, 600 F.3d at 932.  Plaintiff testified about disabling shoulder pain; however, the ALJ cited the many occasions when Plaintiff

engaged in some activity, e.g., moving furniture, that would be precluded by such pain. "'Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility.'" **Medhaug**, 578 F.3d at 817 (quoting <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1148 (8th Cir. 2001)).  Moreover, insofar as Plaintiff described limited daily activities, the ALJ was not obligated to accept that those limitations were caused by his medical impairments.  See **Jones**, 619 F.3d at 975 (affirming adverse credibility determination of ALJ who found claimant's activities to be limited on a "self-imposed voluntary basis" rather than due to her medical condition); **Choate v. Barnhart**, 457 F.3d 865, 871 (8th Cir. 2006) (finding ALJ's adverse credibility determination was supported by record, including the inconsistencies between claimant's "self-reported limitations on his daily activities" and the medical record).

   Plaintiff argues that the ALJ failed in his duty to fully and fairly develop the record by not referring Plaintiff for tests to establish an objective basis for his subjective complaints. "Where 'the ALJ's determination is based on all the evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations,' the claimant has received a 'full and fair hearing.'" **Jones**, 619 F.3d at 969.  Plaintiff received such a hearing.

   Plaintiff next argues that the ALJ erred by relying on the Medical-Vocational Guidelines and not eliciting testimony by a vocational expert (VE).  The ALJ found that Plaintiff's impairments precluded "at most," among other things, overhead work activities with either upper extremity.

In **Marler v. Astrue**, No. 4:09cv1140 TCM, 2010 WL 3239111 (E.D. Mo. 2010), the Court addressed a claimant's argument that the ALJ had erred by not calling a VE because his inability to lift his right arm above his shoulder precluded the use of the Medical-Vocational Guidelines. **Id.** at *17. Citing Social Security Ruling 85-15, 1995 WL 56857, *7 (Soc. Sec. Admin. 1985), the Court noted that a significant limitation on reaching may require testimony from a VE. The Court proceeded to observe that

> In Falcon-Cartagena v. Commissioner of Social Security, 21 Fed. Appx. 11 (1st Cir.2001) (per curiam), the court affirmed the decision of the ALJ applying the Guidelines after finding that the claimant was unable to perform only tasks requiring constant overhead reaching with his left arm and that this restriction had only a marginal effect on the relevant occupational base. Id. at 14. On the other hand, an ALJ's reliance on the Guidelines in Mondragon v. Apfel, 3 Fed. Appx. 912 (10th Cir.2001), was reversed and remanded for vocational expert testimony when the claimant was unable to perform tasks requiring regular overhead reading. Id. at 917. Accord Candelaria v. Barnhart, 195 Fed. Appx. 2, 3-4 (1st Cir.2006).

> Thus, an RFC that precluded constant overhead reaching did not bar the use of the Guidelines, but an RFC that precluded regular overhead reaching did. These holdings capture the concern in Social Security Ruling 85-15 that "[v]arying degrees of limitations [on reaching] would have different effects, and the assistance of a [vocational expert] may be needed to determine the effects of the limitations." Social Security Ruling 85-15, 1995 WL 56857 at *7. Reflecting this concern, the assistance of a VE was called upon in Webb v. Commissioner of Social Security, 368 F.3d 629, 630-31 (6th Cir.2004) (a vocational expert testified that a claimant with an RFC similar to that of Plaintiff's, including no overhead reaching with the right arm, could not perform the full range of sedentary work, but could perform some jobs existing in the national and state economies), and in Koonce v. Apfel, 1999 WL 7864 (4th Cir.1999) (affirming denial of benefits to claimant who could do no overhead reaching and could only use her left arm as an assistive device in case in which those limitations had been presented to VE in hypothetical question).

**Id.** at *17-18.

In the instant case, the ALJ's qualification that Plaintiff's impairment precluded "at most" overhead reaching fails to place the extent of the restriction on the continuum from occasional to constant.  Without a finding of the extent to which Plaintiff cannot do overhead work activities, the Court cannot find that the failure to call a VE to testify was harmless.  Cf. **Howe v. Astrue**, 499 F.3d 835, 840 (8th Cir. 2007) (discussing case in which VE testified about various jobs a claimant could do who was, among other things, able to only occasionally work with his arms overhead); accord **Page v. Astrue**, 484 F.3d 1040, 1044-45 (8th Cir. 2007); **Misner v. Chater**, 79 F.3d 745, 746 (8th Cir. 1996).

Accordingly, the case must be remanded for the limited purpose of defining the extent to which Plaintiff is limited in overhead reaching and eliciting testimony by a VE about the affect of that limitation on his ability to perform substantial gainful activity.

### Conclusion

The ALJ's assessment of Plaintiff's credibility is supported by substantial evidence on the record as a whole.  The ALJ erred, however, by relying on the Medical-Vocational Guidelines without first defining the extent to which Plaintiff is limited in his ability to reach overhead.  Therefore, this case is reversed and remanded for the limited purpose of defining the extent of Plaintiff's overhead reaching limitations and obtaining vocational expert testimony about the occupational consequences of those limitations.  Therefore,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is REVERSED and this case is REMANDED for further proceedings as set forth above pursuant to sentence four of § 405(g).

An appropriate Judgment shall accompany this Memorandum and Order.




/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  21st  day of September, 2011.